## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

MARGARET K. SNOWEL :
12 Rosebay Court :
Germantown, MD 20874 :
:
      Plaintiff, :
: **Civil Action No.:**
v. :
:
**CARLOS DEL TORO, SECRETARY** :
**OF THE NAVY** :
1000 Navy Pentagon :
Washington, D.C. 20350-1200 :
:
      Defendant. :
_____:

## COMPLAINT

Plaintiff, Margaret K. Snowel ("Ms. Snowel" or "Plaintiff"), by and through her undersigned counsel, brings this Complaint against Carlos Del Toro, Secretary of the Navy ("Defendant"), by averring as follows:

## INTRODUCTION

1. This is an action brought by a current employee of the United States Department of the Navy ("Navy" or "Agency") for discrimination based on disability, discrimination for failure to reasonably accommodate her disability, discrimination based on a hostile work environment related to her disability, retaliation for filing complaints about retaliation, and hostile work environment created by retaliation.

2. Ms. Snowel's claims arise pursuant to Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.* ( "Rehab Act").

1

**PARTIES**

3.      Ms. Snowel is a resident of the State of Maryland and suffers from disabilities. At all times relevant to this lawsuit, Ms. Snowel was an employee of Defendant within the meaning of the Rehab Act.

4.      Defendant, Carlos Del Toro, is the Secretary of the Navy and therefore is an "employer" and agency or department head within the meaning of the Rehab Act.

**SUBJECT MATTER JURISDICTION AND VENUE**

5.      Jurisdiction of this matter arises under 28 U.S.C. § 1331 with federal questions involving the Rehab Act.

6.      Venue is proper in the District of Maryland, Southern Division under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because Defendant is located in Montgomery County, Maryland.

**ADMINISTRATIVE UNDERTAKINGS**

DON No. 21-00167-00697

7.      Ms. Snowel filed her first informal complaint of discrimination based on disability with the EEO, Diversity and Inclusion Office ("EEO Office") at that Naval Surface Warfare Center Carderock Division ("NSWC Carderock") on May 11, 2022, within 45 days of experiencing wrongful discriminatory conduct on April 21, 2022.

8.      On June 11, 2022, Ms. Snowel received her Notice of Right to File a formal complaint ("NRTF") by letter dated June 11, 2022, and emailed to Plaintiff on the same day.

9.      On June 21, 2022, with fifteen (15) of receiving the NRTF, Ms. Snowel filed a timely formal complaint with the EEO Office alleging discrimination based on disability and retaliation.

10.    On June 21, 2022, Agency acknowledged receipt of the formal complaint and assigned it as DON-20-00167-00697. ("Complaint 1").

11.    On July 15, 2022, the Agency provided notice of acceptance for investigation of Ms. Snowel's discrimination complaint and accepted the following claims for disability discrimination and retaliation for engaging in protected activity:

a. On April 22, 2021, her request to postpone her mid-year evaluation was denied and her supervisor, Darcy Redding ("Ms. Redding")  included a Labor and Employee Relations Specialist (LERS) in the mid-year evaluation phone call, aggravating Ms. Snowel's anxiety;

b. On or around April 22, 2021, Ms. Redding included several incorrect and negative comments on Ms. Snowel's mid-year review;

c. On May 11, 2021, Ms. Snowel was ordered and required to provide medical documentation in response to her request to take leave on April 23, 2021;

d. On May 12, 2021, Ms. Redding charged Ms. Snowel as absent without leave (AWOL) for April 23, 2021; and

e. On July 20, 2021, Ms. Redding emailed Ms. Snowel directing her to provide a doctor's note for a requested day off, that in the absence of such doctor's note her status would be AWOL, and she needed to report her absence prior to 9:30 am to inform Ms. Darcy that she is taking the day off.

12.    The complaints were amended to include the following claims:

a. Whether Ms. Snowel was subjected to discrimination based on disability and retaliation when, on May 20, 2021, Ms. Snowel was ordered by her fourth level supervisor,

3

Tamar Gallagher ("Ms. Gallagher") to provide a medical note indicating if she was fit for duty to attend an important leadership rotation;

b. Whether Ms. Snowel was subjected to discrimination based on disability and retaliation when on July 16, 2021, Ms. Gallagher denied her reasonable accommodation request and only authorized alternative accommodations; and

c. Whether Ms. Snowel was subjected to discrimination based on disability and retaliation when, on September 16, 2021, Ms. Redding placed negative information in Ms. Snowel's FY 2021 Final Performance Evaluation, which was inaccurate, resulting in two of the five performance goals within the Performance Evaluation being lower than satisfactory, one as "did not meet" and one as "below expectations."

13.     On November 1, 2022, Ms. Snowel amended her claims a second time and the claims were accepted on November 10, 2022.

14.     The Agency investigated all the claims and the Investigative File, along with the notice of rights to elect a final agency decision ("FAD") or a hearing, was provided to Plaintiff on February 18, 2022.

15.     Within thirty (30) days of receipt of the notice of right to elect a hearing, Ms. Snowel submitted her request for a hearing to the EEOC on March 14, 2022.  On October 4, 2023, Ms. Snowel withdrew her request for a hearing.  The Administrative Judge ("AJ") remanded the complaint to the Agency for an FAD.  The Agency issued its FAD on December 4, 2023.

16.     Plaintiff has Ninety (90) days in which to file the instant action from the date of the receipt of the FAD.  Plaintiff has filed this lawsuit within the required 90 day period.

DON No. 22-00167-01338

17.     Ms. Snowel filed additional complaints of disability discrimination and retaliation beginning on June 6, 2022.  These additional complaints arose from the continuing and existing situation that gave rise to her Complaint 1.

18.     On June 6, 2022, Ms. Snowel contacted the Agency's EEO office, beginning the informal EEO process.  On July 22, 2022, the EEO Counselor issued a NRTF.  On July 28, 2022, within the required fifteen days, Ms. Snowel filed her formal complaint for discrimination based on disability and retaliation.  The complaint was assigned the number DON No. 22-00167-01338 (Complaint 2).

19.     Ms. Snowel amended her complaint and those claims were accepted by the Agency on November 16, 2022.

20.     The issues raised in Complaint 2 and investigated by the Agency were whether the Agency discriminated against Ms. Snowel based on her disability and whether the Agency retaliated against her when:

a. On May 31, 2022, Ms. Snowel became aware that Ms. Redding had left her off the email distribution list for her branch and had been left off since, at least, March 2022;

b. On May 31, 2022, upon returning from approved leave, Ms. Snowel encountered excessive overdue work that Ms. Redding was supposed to re-assign while Ms. Snowel was on leave so at to ensure timely processing:

c. In an email dated May 31, 2022, her team lead and first line supervisor had failed to reassign Ms. Snowel's duties while Ms. Snowel was on sick leave and proceeded to identify Ms. Snowel as the person with excessive overdue requests;

d.  On October 3, 2022, Ms. Redding ignored Ms. Snowel's request to increase the spending limit on her government credit card, resulting in ten days of payment delays and requiring intervention by the Department head;

e.  From October 20-28, 2022, Ms. Redding continued to assign new work to Ms. Snowel even though she knew she was on sick leave such that when Ms. Snowel returned, despite significant efforts, she could not finish the work in a timely fashion; and

f.  On November 7, 2022, her third line supervisor, Luke Van Buskirk ("Mr. Van Buskirk"), issued her a Letter of Reprimand, revoking Ms. Snowel's telework – telework she needed to reasonably accommodate her disabilities.

21.     The investigation for these claims was completed on March 16, 2023 and Ms. Snowel was provided the notice of rights with the Investigative file on March 16, 2023.  Ms. Snowel requested a hearing within 30 days of receiving the notice of rights.  On October 4, 2023, Ms. Snowel opted out of the hearing process and requested that the AJ remand the matter to the Agency for an FAD.  On October 4, 2023, the AJ remanded the complaint back to the Agency. The Agency issued its FAD on December 4, 2023 and along with it, provided Ms. Snowel with her rights to file a lawsuit within Ninety (90 ) days of receipt of the FAD.  Ms. Snowel is filing this lawsuit within the 90 day period.

## FACTS

### Background

22.     At all times relevant to this lawsuit, Ms. Snowel was employed as an Administrative/Technical Specialist (NT-0343-04) at the Department of Navy's ("Agency") Procurement Requisition Branch, Operations Department, Naval Warfare Center, Annapolis, Maryland.

23.     Ms. Snowel has been with the Agency since 2002 and in her current position since January 2018.

24.     Ms. Snowel suffers from Generalized Anxiety Disorder, Major Depressive Disorder with Seasonal Pattern/Recurrent with Partial Remission, and Acute Stress Disorder.

25.     The Agency knew of Ms. Snowel's disabilities as early as summer 2017 when she first sought reasonable accommodations for these conditions.

26.     For the periods relevant to this complaint, Ms. Snowel's first line supervisor was Ms. Redding, Branch Head; Joseph Hernandez ("Mr. Hernandez") was the team lead who oversaw Ms. Redding's team and who was the Approving Official under Ms. Redding's direction; Mr. Van Buskirk, Ms. Snowel's third line supervisor; and Tamar Gallagher ("Ms. Gallagher"), Ms. Snowel's fourth line supervisor.

<u>Ms. Snowel's Record of Disability, Prior Reasonable Accommodation,<br>and Knowledge of Protected Activity</u>

27.     The Agency knew of Ms. Snowel's disabilities as early as summer 2017 when Ms. Snowel first filed a request for reasonable accommodation.  Mr. Van Buskirk was aware of Ms. Snowel's disability in 2019 because Ms. Snowel informed him that she suffered from Generalized Anxiety Disorder.  Ms. Gallagher and Ms. Redding were made aware of Ms. Snowel's disabilities in January/February of 2020 when Ms. Snowel sought a reasonable accommodation to allow her not to be supervised by Ms. Redding.  Mr. Hernandez knew of Ms. Snowel's disabilities and need for reasonable accommodations no later than March 9, 2020 because he was involved and provided testimony in an investigation in early 2020 pertaining to Ms. Snowel's complaints about Ms. Redding.

28.     As of early 2020, Ms. Snowel was being subjected to Ms. Redding's mistreatment and due to the mistreatment and its effect on Ms. Snowel's disabilities, Ms. Snowel sought a

reasonable accommodation and asked that she be realigned to be supervised by someone other than Ms. Redding.

29.     In February of 2020, Ms. Snowel was placed under Mr. Van Buskirk's supervision and Ms. Reddy was not allowed to contact her.  Ms. Snowel remained under Mr. Van Buskirk's supervision for nine months.

30.     During this nine month period, Ms. Snowel had no issues with her work or Mr. Van Buskirk. Any matter that needed addressing, as is typical in any workplace, was handled professionally and without criticism. Due to the professional and supportive workplace during this nine month period, Ms. Snowel's anxiety was manageable.

31.     This reasonable accommodation was removed on October 1, 2020, at which point Ms. Snowel was placed back under Ms. Redding's supervision.

32.     Though Ms. Snowel was very apprehensive and fearful about this development, for the first few months back with Ms. Redding, things appeared to have improved. Unfortunately, by early 2021, Ms. Redding was back to mistreating Ms. Snowel.

Discriminatory and Retaliatory Conduct

33.     Beginning in late March of 2020, the Agency set up telework for its employees, to address the Covid pandemic.

34.     For that reason, when Ms. Snowel was placed back under Ms. Redding's direct supervision, telework allowed Ms. Snowel a measure of reprieve in not having to deal with Ms. Redding face to face. Ultimately, telework did not serve to shield Ms. Snowel from Ms. Redding's caustic and toxic actions, all of which Ms. Redding knew triggered extreme anxiety in Ms. Snowel.

35. Despite knowing about Ms. Snowel's disabilities and Ms. Snowel's concern of having to deal with Ms. Redding, on April 20, 2021, Ms. Redding directed Ms. Snowel to attend a meeting with her to discuss Ms. Snowel's mid-year performance to be held on April 22, 2021.

36. On April 21, 2021, Ms. Snowel asked Ms. Redding if the communications about her mid-year review could be in writing because Ms. Redding's treatment of her caused her to experience extreme anxiety and rendered her too anxious to properly communicate. Ms. Snowel requested that, at a minimum, it be postponed until after her scheduled leave.

37. Ms. Redding refused to postpone the meeting or to limit the communications to written communications and, instead, ordered Ms. Redding to attend the telephonic meeting, threatening adverse action if Ms. Snowel did not comply.  Ms. Snowel had reached out to Mr. Van Buskirk for assistance but Ms. Redding scolded Ms. Snowel, telling her that Mr. Buskirk could not be involved.

38. On the day of the meeting, Ms. Snowel was experiencing extreme anxiety due to the upcoming meeting.

39. Ms. Snowel began the meeting but was overcome with anxiety and experienced extreme panic and had to leave the meeting.

40. Management acknowledged that Ms. Snowel sounded very shaky and agitated during the meeting.

41. Despite several levels of management knowing about Ms. Snowel's disability and her difficulty with Ms. Redding's treatment of her, they forced her, under threat of discipline, to have the telephonic meeting with Ms. Redding.

42. Though Ms. Redding knew Ms. Snowel was agitated and shaky, she, nonetheless, emailed Ms. Snowel the mid-year performance review, which contained many negative comments.

43. Ms. Redding marked Ms. Snowel as "Below Expectations" for Leadership and "Did Not Meet" for technical competence.

44. Ms. Redding did not have justification for providing Ms. Snowel with a negative rating because Ms. Snowel's work was, at a minimum, satisfactory in all elements. Many of the critiques Ms. Redding noted were not Ms. Snowel's failures. It was also telling that Ms. Redding was focused on Ms. Snowel's disability issues, which she concluded as being behavioral matters.

45. Despite the difficult day, Ms. Snowel, managed to continue working into the evening.

46. On April 23, 2021, Ms. Snowel was not feeling well after what she had been through the day before and submitted a sick leave request to Ms. Redding to be off that day. Ms. Redding sent Ms. Snowel an email directing her that she had fifteen calendar days to submit medical documentation supporting the sick day. Ms. Snowel did not receive that direction until she returned from her approved leave.

47. Ms. Snowel was on approved leave immediately following April 23, 2021 and did not return to work until May 11, 2021, so she had no knowledge of Ms. Redding's request for a doctor's note until she returned to work.

48. In the over 20 years Ms. Snowel had worked there, she had not had to provide a doctor's note when taking sick leave.

49.	Upon her return to work and seeing the direction to provide the doctor's note, Ms. Snowel quickly contacted her medical provider and was able to secure a note.  Ms. Snowel provided the note to Mr. Van Buskirk and asked him to inform Ms. Redding that she had provided the note.

50.	Despite knowing that Ms. Snowel was out on leave and would not have seen the direction to provide the note, Ms. Redding rushed to charge Ms. Snowel with being Absent Without Leave ("AWOL") and did so even after Ms. Snowel had provided a doctor's note immediately upon her return to Mr. Van Buskirk, Ms. Redding's supervisor, and informed him to alert Ms. Redding.

51.	Ms. Redding's unnecessary anger and aggression towards Ms. Snowel was not the same way she treated Ms. Snowel's co-workers.  Ms. Redding's default way to treat Ms. Snowel was to threaten discipline, ignore Ms. Snowel's concerns, use a sharp tone both verbally and in writing, and to minimize Ms. Snowel's needs arising from her disabilities.

52.	There was no valid reason to mark Ms. Snowel as AWOL, other than to punish her for experiencing symptoms due to her disability.  Despite Ms. Redding knowing that Ms. Snowel had disabilities that required her to take off, she place her in AWOL status.

53.	Ms. Snowel had been chosen for and approved to be on a leadership rotation in Idaho from May 30, 2021 to July 9, 2021.  Ms. Snowel was to go on previously approved annual leave from July 12-18, 2021.

54.	On May 12, 2021, Ms. Snowel emailed Ms. Gallagher that she had initiated the EEO process, and that under the current circumstances it was impossible to do her job. She asked to be realigned to work under Mr. Van Buskirk.  She wrote that she needed to be able to do her

11

job for the upcoming two weeks and while in Idaho, but she could not do that if Ms. Redding had access to retaliate against her.

55.     On May 17, 2021, Ms. Snowel emailed Ms. Gallagher and requested immediate relief from the hostile work environment created by Ms. Redding.

56.     As an interim accommodation, Ms. Gallagher approved Ms. Snowel's sick leave until May 28, 2021, pending receipt of medical documentation.

57.     On May 20, 2021, Ms. Gallagher questioned Ms. Snowel as to whether she was "fit for duty" so as to be able to attend the leadership rotation and demanded that Ms. Snowel provide medical documentation from Ms. Snowel's doctor addressing that she was medically able to attend.

58.     Ms. Gallagher questioned her even though Ms. Gallagher knew the reason for needing to take sick leave was because of Ms. Redding's treatment of Ms. Snowel, which caused Ms. Snowel's anxiety to escalate.

59.     Further, Ms. Gallagher knew that Ms. Snowel had been approved to attend the leadership rotation and that Ms. Snowel was looking forward to going on this leadership rotation, Ms. Snowel had informed Ms. Gallagher that it was important for Ms. Snowel's career advancement, and Ms. Snowel had made clear that it would be good for Ms. Snowel to be away from Ms. Redding.

60.     Fearing that she would not be able to attend the already approved program, and under threat by Ms. Gallagher, Ms. Snowel had her doctor provide another note.  The doctor noted that when Ms. Snowel was not reporting directly to Ms. Redding, there were no factors impeding her ability to do her job and further indicated that there was no indication that Ms. Snowel would have any problems performing her duties in Idaho as long as she was away

from Ms. Redding.

61.     Ms. Snowel returned to work from the leadership program on July 19, 2021 and worked a few hours, then sent a leave request for the rest of the day. Ms. Snowel logged into work on July 20, 2021 but was not feeling well.  Ms. Redding sent Ms. Snowel an email at 10:30 a.m. on July 20, 2021.  Ms. Snowel informed her that she was not feeling well and would send her a leave request shortly. At that point, Ms. Redding threatened her with AWOL and told her she was in violation of policy for not logging in before 9:30 am.

62.     Ms. Snowel's apprehension about returning to work under Ms. Redding was well placed because as soon as she returned, Ms. Redding was coming after Ms. Snowel.

63.     Though Ms. Redding had been informed by Ms. Snowel and other management that her disabilities are worsened by Ms. Redding's behavior, Ms. Redding continued to treat Ms. Snowel aggressively, with threats of discipline.

64.     Ms. Snowel explained that on days where she was not feeling well, she might not be able to log on by 9:30 a.m. or provide prior notice to Ms. Redding, but that she would provide it when she was reasonably able to.

65.     Once again, Ms. Redding required that Ms. Snowel submit another doctor's note to justify her sick leave for July 20, 2021.

66.     Due to this mistreatment, and anticipating continued failure to accommodate Ms. Snowel's disabilities, Ms. Snowel submitted a Family and Medical Leave Act request on July 28, 2021, which was approved the next day.

67.     As to the pending request for a reasonable accommodation to allow Ms. Snowel to be realigned away from Ms. Redding, management refused this request.  Instead, if offered only to limit one-on-one communications (not eliminate them), to have a third party present if

13

there was a one-on-one communication with Ms. Redding, to have the bulk of communication occur by email to the extent possible, to allow Ms. Snowel to telework, and to provide Ms. Snowel advanced notice of a meeting with Ms. Redding, where possible.

68.     Ms. Redding provided a low performance rating to Ms. Snowel for the October 1, 2020 to September 30, 2021 period.  Ms. Redding assigned her a rating of "did not meet" for Collaboration and Customer Care, and a rating of "below expectations" for Resource Management. Ms. Redding did this despite the fact that Ms. Snowel's performance was not problematic.

69.     The issues with Ms. Redding continued but Ms. Snowel tried to limit her contact with Ms. Redding and hoped to keep some distance from her.

70.     On May 31, 2022, Ms. Snowel became aware that she had been left off Ms. Redding's distribution list for the branch and had not been included since March 2022.

71.     The distribution list is used to notify the branch of any work items, new policies, deadlines and the like.  Without receiving these notices, Ms. Snowel was not alerted to work developments and requirements.

72.     Once Ms. Snowel found this out, she informed both Ms. Redding and Ms. Gallagher that she had been removed from the list, but they failed to address it and it was only after Ms. Snowel filed the EEO complaint including this omission that she was placed back on the distribution list.

73.     On May 31, 2022, Ms. Snowel returned from approved leave and noticed that she had been assigned additional work while she was out sick, which was against normal protocol. This meant that she returned with all that was in her queue before she left and an additional amount of work piled on top of that.

14

74.    Usual protocol is that when someone is out, what is in their queue is reassigned and no additional work is assigned to that person while they are out.  If one knows in advance that they will be out, they work to get the work done that is in their queue before leaving.  When the leave is unscheduled, it is not possible to do so.  In that situation, that work is to be reassigned to others.

75.    Ms. Snowel had been out on unscheduled sick leave and had no way to tackle the queue.  She informed Ms. Redding that she would need the work in the queue reassigned.

76.    Despite this, Ms. Redding left the work in her queue and assigned her additional work while Ms. Snowel was out on sick leave.

77.    Adding to this discriminatory and retaliatory behavior, is that Ms. Snowel's team lead, Mr. Hernandez, who had already expressed that he did not believe Ms. Snowel deserved reasonable accommodations and who had disparaged her in the workplace, sent out an email to many employees identifying Ms. Snowel as the lone buyer with excessive overdue requests.

78.    Mr. Hernandez knew that Ms. Snowel was out sick, had a disability, had requested reasonable accommodations, and had filed EEO complaints, including against him.  Though he knew he was supposed to redistribute the work and not assign her more work, he failed to redistribute the work, he assigned her more work, and he pointed her out as being the problem.

79.    Mr. Hernandez had previously expressed disgust that Ms. Snowel was filing complaints as a means to try to avoid her work obligations.

80.    On October 4, 2022, Ms. Snowel requested an increase on her spending limit on her government credit card, so as to be able to do her work.  Ms. Redding ignored this request and it resulted in ten days of payment delays and eventually required intervention from a higher

level.  Usually, credit card limit increases are addressed quickly so as to allow the employee to keep working and to avoid delays.

81.     From October 20 – 28, 2022 Ms. Snowel was out on sick leave.  Ms. Redding, again, continued to assign new work to Ms. Snowel, even though she knew Ms. Snowel was on sick leave.  When Ms. Snowel returned to work, she was faced with a large number of reconciliations to take care of and she was, therefore, unable to complete them by the time they were due.  Mr. Hernandez was also part of this debacle and it was in keeping with his continued desire to go after Ms. Snowel for having a disability, requesting reasonable accommodations, and filing EEO complaints.

82.     On October 30, 2022, Ms. Redding provided yet another performance appraisal that failed to take Ms. Snowel's accomplishments into consideration and criticized her, without basis.

83.     On November 7, 2022, Mr. Van Buskirk issued Ms. Snowel a letter of reprimand, without basis.  Ms. Snowel had previously sent an email to Mr. Van Buskirk and the branch employees informing them that she believed that Ms. Redding was too critical, was threatening overtime when everyone was already overworked, and that she was being unsupportive.  Mr. Van Buskirk's response to Ms. Snowel's concerns was to discipline Ms. Snowel, instead of looking into the concerns.  Mr. Van Buskirk then discontinued her telework, thereby placing her in a predicament due to her disabilities.

84.     Notably, Mr. Van Buskirk had been Ms. Snowel's mentor for a number of years, to as far back as 2019.  Ms. Snowel had previously enjoyed a close working relationship with him and often sought out his support and advice.  Ms. Snowel often visited him at his office and they would discuss the workplace and Ms. Snowel's concerns about Ms. Redding, among other

16

things. During these discussions, Ms. Snowel had informed Mr. Van Buskirk that she had an anxiety disorder and that Ms. Redding's treatment of her aggravated her anxiety.  Mr. Van Buskirk admitted to knowing about the anxiety disorder as of 2019.

85.     Ms. Snowel believed Mr. Van Buskirk to be a mentor to her and their conversations often went well beyond work hours.

86.     Mr. Van Buskirk's interest in Ms. Snowel was out of the ordinary but Ms. Snowel was grateful in that she thought Mr. Van Buskirk had her back and understood the issues she was confronting with Ms. Redding.

87.     As Ms. Snowel escalated her EEO matters and Mr. Van Buskirk began having to provide declarations in the investigations, his attitude towards Ms. Snowel became more distant.

88.     During the time when Mr. Van Buskirk welcomed Ms. Snowel into his office regularly, Ms. Snowel spoke freely with him about Ms. Redding and other work issues.  As such, when Ms. Snowel shared her concerns with Mr. Van Buskirk in the email and he responded with discipline, it surprised Ms. Snowel.

## COUNT I

### THE REHABILITATION ACT
### Failure to Reasonably Accommodate/Failure to Engage in the Interactive Process

89.     Ms. Snowel incorporates by reference all allegations contained in the Complaint as if fully set forth herein.

90.     At all times relevant to this Complaint, Ms. Snowel was an employee of Defendant and Defendant was an employer within the meaning of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*

91.     Section 501 of the Rehab Act incorporates certain provisions of the Americans with Disabilities Act ("ADA"), as amended ("ADAAA"), relating to employment discrimination

17

and expressly prohibits employers from discriminating against an otherwise qualified individual with a disability.

92.     During all times specified in the Complain that are relevant to this Lawsuit, Ms. Snowel was an individual who suffered from mental health disabilities which limited her ability to focus and concentrate when she was experiencing a mental health setback.

93.     Ms. Snowel's mental health diagnoses were conditions and impairments constituting disabilities, either in whole or in part, which substantially limited one of more of her major life activities.  Ms. Snowel, therefore, was a qualified individual with a disability as that term is defined by the ADA as amended by the ADAAA, and as recognized by the Rehab Act.

94.     Defendant knew about Ms. Snowel's disabilities and the Agency knew that Ms. Snowel had developed a record of a disability with the Agency.  Ms. Snowel, therefore, was a qualified individual with a disability as that term is defined by the ADA, as amended by the ADAAA, and as recognized by the Rehab Act.

95.     During all times as set forth in the Complaint and relevant to the Lawsuit, Defendant and its agents and employees: (a) have engaged in unlawful employment practices against Ms. Snowel on the basis of her disabilities; (b) have repeatedly failed to promptly engage in the interactive process of accommodation; and (c) have unreasonably refused reasonable accommodations in violation of the ADA, and as recognized by the Rehab Act.

96.     Notwithstanding Ms. Snowel's repeated requests for a reasonable accommodation, Defendant failed to promptly engage in the interactive process and failed to reasonably accommodate Ms. Snowel.

97.     Ms. Snowel repeatedly addressed management's failure to address her requests and her need for an accommodation.

98.     The discrimination against Ms. Snowel caused her to sustain damages, including but not limited to, emotional pain, mental anguish, loss of income and other economic benefits, all justifying an award of compensatory damages.

99.     The actions of Defendant were done in disregard of the protected rights of Ms. Snowel.

WHEREFORE, Ms. Snowel demands judgment against Defendant and seeks the following relief:

      a.     Back pay, front pay and other economic damages;

      b.     Compensatory damages;

      c.     Prevailing party attorneys' fees, expenses, and costs;

      d.     Pre and Post-Judgment interest; and

      e.     equitable relief.

## **COUNT II**

### **THE REHABILITATION ACT**
#### **Interference**

100.     Ms. Snowel incorporates by reference all allegations contained in all paragraphs of the Complaint as if fully set forth herein.

101.     Defendant interfered with Ms. Snowel's rights under the Rehab Act by denying her requests for a reasonable accommodation, failing to engage in the interactive process, taking actions to dissuade Ms. Snowel from seeking protections under the Rehab Act, and taking actions to dissuade Ms. Snowel from asserting her rights under the Rehab Act.

102.     Defendant's interference against Ms. Snowel included unwarranted scrutiny over her in the workplace, disallowing her to take leave, increasing her workload while she was out on sick leave, threatening her with AWOL, threatening her with discipline, categorizing her sick

leave as AWOL, causing her to lose income, disciplining her, lowering her performance appraisal, holding her out for ridicule, forcing her to interact with her supervisor, denying her a transfer, blaming her for systemic work issues, questioning her disability, casting her disability as a behavioral issue, along with other discriminatory conduct, all of which caused her to sustain damages, including but not limited to, emotional pain, mental anguish, and humiliation and embarrassment, justifying an award of compensatory damages.

103.    The actions of Defendant were done in disregard of the protected rights of Ms. Snowel.

WHEREFORE, Ms. Snowel demands judgment against Defendant and seeks the following relief:

       a.    Back pay, front pay and other economic damages;

       b.    Compensatory damages;

       c.    Prevailing party attorneys' fees, expenses, and costs;

       d.    Pre and Post-Judgment interest; and

       e.    Equitable relief.

## COUNT III

## RETALIATION- REHAB ACT

104.    Ms. Snowel incorporates by reference all paragraphs contained in the Complaint as if fully set forth herein.

105.    At all times relevant to this Lawsuit, Ms. Snowel was an "employee" and the Agency was an "employer" within the meaning of the REHAB Act.

106.    During the times specified in the Complaint, Ms. Snowel repeatedly engaged in protected activity by opposing, complaining, and raising the Agency's illegal and discriminatory

and harassing practices.  Ms. Snowel did this by filing EEO complaints and repeatedly complaining directly to various management officials.

107.   The Rehab Act makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding.

108.   The Agency violated Ms. Snowel's right to equal employment opportunity by retaliating against her when it took adverse actions against her, repeatedly thwarted her professional career advancement, and otherwise engaged in actions designed to dissuade her from making or supporting complaints or engaging in further protected activity, all of which caused Ms. Snowel ongoing emotional harm in violation of the anti-retaliation provisions of the Rehab Act.

WHEREFORE, Ms. Snowel demands judgment against Defendant and seeks the following relief:

     a.   Economic damages;

     b.   Compensatory damages;

     c.   Prevailing party attorneys' fees, expenses, and costs;

     d.   Pre and Post-Judgment interest;

     e.   Injunctive relief; and

     f.   Such other relief as her causes permit.

## COUNT IV

## HOSTILE WORKING ENVIRONMENT – RETALIATION

109.   Ms. Snowel incorporates by reference all paragraphs contained in the Complaint as if fully set forth herein.

110. At all times relevant to this Complaint, Ms. Snowel was an employee and Defendant was an employer within the meaning of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq*.

111. Section 501 of the Rehab Act incorporates certain provisions of the Americans with Disabilities Act ("ADA"), as amended ("ADAAA"), relating to employment discrimination, and expressly prohibits employers from discriminating against an otherwise qualified individual with a disability.

112. During all times specified in the Complaint that are relevant to this Lawsuit, Ms. Snowel was an individual who suffered from mental health disabilities which limited her ability to concentrate and think clearly when she was experiencing a flareup.

113. These conditions and impairments constituted disabilities, either in whole or in part, which substantially limited one or more of Ms. Snowel's major life activities. Ms. Snowel was therefore a qualified individual with a disability as that term is defined by the ADA as amended by the ADAAA, and as recognized by the Rehab Act.

114. Defendant and its agents knew of Ms. Snowel's disabilities and she had developed a record of her disabilities with the Agency. Ms. Snowel was, therefore, a qualified individual with a disability as that term is defined by the ADA, as amended by the ADAAA, and as recognized by the Rehab Act. At all times relevant to this Lawsuit, Ms. Snowel was an "employee" and the Agency was an "employer" within the meaning of the Rehab Act.

115. During the times specified in the Complaint, Ms. Snowel repeatedly engaged in protected activity by opposing, complaining, and raising the Agency's illegal and discriminatory and harassing practices. Ms. Snowel did this by filing EEO complaints and repeatedly complaining directly to various management officials.

22

116.    The Rehab Act makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding.

117.    The Rehab Act makes it unlawful for an employer to create and/or allow a hostile work environment due to an employee's prior protected activity.

118.    The Agency violated Ms. Snowel's right to Equal Employment Opportunity by creating and allowing hostile working environment against her due to her prior protected activity, including repeated threats to discipline her, imposing unwarranted deadlines, removing her from important employee communications, burdening her with additional work while she was out on sick leave, failing to assign her work to others while she was out on sick leave, questioning her use of leave for her disability, holding her out for ridicule, speaking to her angrily, belittling her, finding fault in her work, included unwarranted scrutiny over her in the workplace, disallowing her to take leave, threatening her with AWOL, categorizing her sick leave as AWOL, causing her to lose income, disciplining her, lowering her performance appraisal, forcing her to interact with her supervisor, denying her a transfer, blaming her for systemic work issues, questioning her disability, casting her disability as a behavioral issue, along with other discriminatory conduct, which collectively were designed to dissuade her from making or supporting complaints or engaging in further protected activity, all of which caused Ms. Snowel ongoing emotional harm in violation of the anti-retaliation provisions of the Rehab Act.

WHEREFORE, Ms. Snowel demands judgment against Defendant and seeks the following relief:

a.    Economic damages;

b.    Compensatory damages;

c.      Prevailing party attorneys' fees, expenses, and costs;

d.      Pre and Post-Judgment interest;

e.      Injunctive relief; and

f.      Such other relief as his causes permit.

## COUNT V

## HOSTILE WORK ENVIRONMENT - DISABILITY

119.    Ms. Snowel incorporates by reference all allegations contained in all paragraphs of the Complaint as if fully set forth herein.

120.    At all times relevant to this Complaint, Ms. Snowel was an employee and Defendant was an employer within the meaning of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq*.

121.    Section 501 of the Rehab Act incorporates certain provisions of the Americans with Disabilities Act ("ADA"), as amended ("ADAAA"), relating to employment discrimination, and expressly prohibits employers from discriminating against an otherwise qualified individual with a disability.

122.    During all times specified in the Complaint that are relevant to this Lawsuit, Ms. Snowel was an individual who suffered from mental health disabilities which limited her ability to concentrate and think clearly when she was experiencing a flareup.

123.    These conditions and impairments constituted disabilities, either in whole or in part, which substantially limited one or more of Ms. Snowel's major life activities.  Ms. Snowel was therefore a qualified individual with a disability as that term is defined by the ADA as amended by the ADAAA, and as recognized by the Rehab Act.

24

124.    Defendant and its agents knew of Ms. Snowel's disabilities and she had developed a record of her disabilities with the Agency.  Ms. Snowel was, therefore, a qualified individual with a disability as that term is defined by the ADA, as amended by the ADAAA, and as recognized by the Rehab Act.

125.    The Agency violated Ms. Snowel's right to Equal Employment Opportunity by creating and allowing hostile working environment against her due to her disability, including but not limited to, repeated threats to discipline her, imposing unwarranted deadlines, removing her from important employee communications, burdening her with additional work while she was out on sick leave, failing to assign her work to others while she was out on sick leave, questioning her use of leave for her disability, holding her out for ridicule, speaking to her angrily, belittling her, finding fault in her work, included unwarranted scrutiny over her in the workplace, disallowing her to take leave, threatening her with AWOL, categorizing her sick leave as AWOL, causing her to lose income, disciplining her, lowering her performance appraisal, forcing her to interact with her supervisor, denying her a transfer, blaming her for systemic work issues, questioning her disability, casting her disability as a behavioral issue, along with other discriminatory conduct.

126.    The conduct as alleged was an adverse action, consisting of unwelcome harassment on the basis of disability that was severe and pervasive, and that altered the conditions of her employment and created an abusive atmosphere.

127.    The Agency knew about the hostile work environment against Ms. Snowel because she repeatedly complained to management and engaged in additional protected activity when she filed her various EEO complaints.

128.     The Agency failed to promptly address and remediate the harassment in question allowing a continuing abusive work environment.

129.     The Agency violated Ms. Snowel's right to equal employment opportunity by allowing and failing to rectify a hostile work environment based on her disability, which environment was continuously caustic and harmful, all the while causing Ms. Snowel ongoing emotional and psychological harm.

130.     The actions of Defendant were taken in disregard of the protected rights of Ms. Snowel.

WHEREFORE, Ms. Snowel demands judgment against Defendant and seeks the following relief:

> a.     Back pay, front pay and other economic damages;
>
> b.     Compensatory damages;
>
> c.     Prevailing party attorneys' fees, expenses, and costs;
>
> d.     Pre and Post-Judgment interest; and
>
> e.     equitable relief.

### DEMAND FOR TRIAL BY JURY

Ms. Snowel demands a trial by jury on all claims that authorize a jury trial.

Respectfully Submitted,

*/s/ Ruth Ann Azeredo*
Ruth Ann Azeredo (No. 16175)
1997 Annapolis Exchange Parkway
Suite 300
Annapolis, MD 21401
(410) 588-1915
(410) 558-1916
(410) 558-1917
DATE: March 3, 2024                    ruthazeredo@azeredolegal.com

26